**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X

| | | |
|---|---|---|
| STEPHEN CALLAHAN, | : | |
| | : | Civil Action No.: |
| Plaintiff, | : | |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| HSBC SECURITIES (USA) INC., HSBC NORTH | : | |
| AMERICA HOLDINGS INC. and HSBC | : | **Jury Trial Demanded** |
| HOLDINGS PLC, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------X

Plaintiff Stephen Callahan ("Callahan" or "Plaintiff"), by and through his attorneys,

Wigdor LLP, as and for his complaint against Defendants HSBC Securities (USA) Inc. ("HSBC

Securities"), HSBC North America Holdings Inc. ("HSBC North America") and HSBC Holdings

plc (collectively, "HSBC," the "Bank" or "Defendants") hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      HSBC has a history of engaging in front-running—the unlawful practice of using

non-public client information to trade for the Bank's "proprietary" account to the detriment of its

own customers.  Indeed, in 2018, the Bank paid more than $100 million to resolve criminal

allegations involving a "front-running scheme that enabled [the Bank] to acquire millions of

dollars to benefit [the] institution and harm [its] clients."[1]  As part of the deal with federal

prosecutors, HSBC agreed to "enhance its compliance program" and, among other things,

"terminat[e] the employment of employees involved in wrongdoing."[2]  Sadly, nothing has

---

[1]      https://www.justice.gov/opa/pr/hsbc-holdings-plc-agrees-pay-more-100-million-resolve-fraud-charges

[2]      Id.

changed.

2.      In 2021, Callahan arrived at HSBC as a trader.  Almost immediately, he witnessed rampant front-running, including directives to junior traders to "always" prioritize the Bank's proprietary account.  Callahan protested, warning junior traders that front-running was unlawful and repeatedly complaining to management about the "epic" front-running problem.  HSBC promptly retaliated against Callahan by failing to promote him, suspending him, withholding his annual bonus and ultimately firing him.

3.      Defendants' conduct violated New York Labor Law § 740 which prohibits an employer from taking any retaliatory action against an employee, including suspension or termination, because the employee disclosed, or threatened to disclose, the employer's unlawful activity.[3]

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship among the parties, and this action involves an amount in controversy exceeding $75,000, excluding interests and costs.

5.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to this action occurred there, including Plaintiff's employment and performance, and the unlawful employment practices alleged herein.

---

[3]      Plaintiff has also filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that Defendants violated whistleblower provisions of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. 1514A.

## PARTIES

6.      Plaintiff Stephen Callahan is a former Director at HSBC.  At all relevant times, Plaintiff was an "employee" under New York Labor Law § 740.  Plaintiff is domiciled in Florida.

7.      Defendant HSBC Securities, a bank holding company incorporated in Maryland with its principal executive offices at 452 5th Avenue, New York, NY 10018-2706, is a wholly-owned subsidiary of HSBC North America.  At all relevant times, HSBC Securities was an "employer" under New York Labor Law § 740.

8.      Defendant HSBC North America, the holding company for HSBC Holding plc's operation in the United States, is a Delaware corporation with its headquarters in New York City at 452 5th Avenue, New York, NY 10018-2706.  It is an indirect wholly-owned subsidiary of HSBC Holdings plc.  At all relevant times, HSBC was an "employer" under New York Labor Law § 740.

9.      Defendant HSBC Holdings plc is a British multinational bank and financial services holding company headquartered at 8 Canada Square in London E14 5HQ, United Kingdom.  At all relevant times, HSBC was an "employer" under New York Labor Law § 740.

## FACTUAL ALLEGATIONS

### I.      BACKGROUND

10.      Stephen Callahan has been a trader for almost 30 years.

11.      For the first decade of his career, he traded for small firms, graduating in the next decade to work for some of the most prominent firms on Wall Street, including Bear, Stearns & Company, Barclays Capital and Morgan Stanley & Company.

3

12.     During this middle phase of his career, Callahan held senior roles at each of these firms and was twice elevated to running businesses.

13.     In 2011, Callahan decided to change his domicile to Florida.  He worked as a macro hedge fund manager in the U.S. Rates Business for Rosenthal Collins until 2019, when he moved with the Collins group of traders to DV Trading.

14.     In 2021, Callahan was approached by Joseph Leary (former Managing Director/Co-Head of Developed Rates Trading) about working as a Director with HSBC to help run its U.S. Rates trading desk (the "desk").

15.     Leary said he needed a senior person like Callahan because he was being given additional duties that would draw his attention elsewhere.

16.     He was eager to hire Callahan, not just for Callahan's seniority, but because Callahan could increase the Bank's penetration with senior money managers with whom he had developed trusted working relationships.

17.     Callahan was drawn to the opportunity because Leary assured him that Callahan had a good chance of heading the desk, which would include hiring a new coterie of traders.

18.     Callahan also found the job appealing because he and Leary had complimentary skill sets, and he missed the camaraderie of working with a team after almost a decade of trading on his own.

19.     Shortly after Callahan received his offer letter but before he accepted the position, Leary left to take a job at another bank.

20.     As a result, Callahan reached out to Leary's supervisor,[4] Jason Henderson (Executive Vice President, Head of Markets and Securities Services, North America), for assurance that he could be a potential replacement for Leary.

21.     With Henderson's agreement, Callahan accepted the Bank's offer.

22.     Shortly before Callahan's start date, Henderson announced that William "Bill" Glenn would be elevated above Callahan to desk manager on an interim basis.

23.     Henderson reassured Callahan that this was a temporary move made strictly for compliance reasons, as the desk had a significant number of junior traders and Callahan could not officially supervise the desk until he had passed his licensing exams.[5]

24.     Callahan started working at HSBC on August 23, 2021.

25.     During his first few weeks, Callahan and Henderson discussed their vision for new hires to remake the trading desk and Callahan began interviewing candidates.

26.     Callahan also spent this time studying for his licensing exams and learning about HSBC's business.

## II.     CALLAHAN COMPLAINS ABOUT ILLEGAL FRONT-RUNNING

27.     The HSBC U.S. Rates trading desk is designed with open-plan seating where traders sit next to each other, without cubicles or other barriers between them.

28.     As a result, traders can easily observe and overhear their colleagues' conversations.  Almost from the outset of his employment and throughout his tenure at the Bank, Callahan observed traders engaging in front-running.

---

[4]     Leary reported to Henderson and Mehmet Mazi (Head of Global Debt Markets).
[5]     Callahan was required to retake the exams because his licenses had lapsed.  His work at Rosenthal Collins and later at DV Trading did not require licensure.

29.     He saw traders with non-public knowledge of impending orders routinely trade for the Bank's proprietary account ahead of placing a client's order to influence the price of the security, such that the Bank would maximize its upside and minimize its downside at the expense of the customer.

30.     Front-running is a violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Exchange Act Rules 10b-5(a) and (c), and Financial Industry Regulatory Authority ("FINRA") Rule 5720, among other laws and rules.

31.     Callahan observed front-running most frequently with "long end" securities (those on the yield curve of more than ten years) where there is more price volatility, making it easier for traders to move the price so that they can buy from, or sell to, the customer to garner a profit, or limit a loss for the Bank.

32.     For example, Callahan noticed that HSBC traders would routinely prevent prices from being auto quoted because the auto quotes on the "long end" were lower than the rest of the market, and traders wanted to be able to move the price of the security to bid or offer at a lower price than the auto quote.

33.     On one occasion in particular, in or about September 2021, Callahan overheard Brian Yip (Former Vice President, U.S. Rates Trading – TIPS and Inflation Derivatives) instruct junior trader Russell Dean to "always" buy or sell for the Bank before putting a price on a transaction for a customer.

34.     Concerned both that Yip was engaging in front-running and teaching less experienced traders to do the same, Callahan warned Dean about front-running.

35.     Dean confirmed that he had been instructed by Yip to engage in the practice.

36.     Callahan alerted Glenn, the desk supervisor, stating that the practice was unacceptable.

37.     Glenn seemed unconcerned and did not respond, other than to say, "Ok."

38.     In another example from later in the fall of 2021, HSBC customer Lundy Wright (Senior Vice President and Portfolio Manager at George Weiss Associates) asked Jae Yang (Rates Trader – Director) for an offer on 50 million five-year securities.

39.     Yang responded with an offer and ended up losing money on the trade.

40.     Wright then asked Yang for another offer on 50 million five-year securities.

41.     Callahan overheard Yang state that he was going to buy (or "lift") five-year securities in front of Wright.

42.     Yang then placed two separate trades to buy five-year securities before giving Wright an offer.

43.     He then struck a deal to sell the securities Wright at a higher price, resulting in a profit for HSBC at Wright's expense.

44.     Callahan, surprised that Yang would openly announce that he intended to engage in front-running, asked Ed Takvor (U.S. Rates Trader), "Did I hear that right?"

45.     Takvor nodded in agreement.

46.     Callahan turned to Glenn and stated, "I can't believe Yang just said that."

47.     Glenn pretended not to have heard Yang announce his unlawful activity.

48.     Callahan told Glenn, in no uncertain terms, that front-running was illegal, the SEC was currently looking at front-running in equities and that it could not happen on their desk.

49.     Glenn then claimed—disingenuously—that he did not know what Yang had done was illegal.

50.     Callahan pushed back by stating that Glenn could not be ignorant of the illegality of front-running given his many years as a trader and the common knowledge that a trader cannot enter the market to place a trade for the Bank before the price for the same security has been agreed upon with the customer.

51.     Takvor again agreed.

52.     Callahan further stated that he had observed Glenn engaging in front-running himself since Glenn took over the bond seat from Yip.  Glenn did not respond.

53.     Callahan stated that he was "not going to jail," meaning that he did not want any part of the illegal activity.

54.     Later that day, Callahan reported the incident to Michael Brennan, the HSBC salesman for Wright's firm, and his junior associate, Daniel Wolff.

55.     Both Brennan and Wolff admitted that front-running happened frequently at HSBC.

56.     Callahan also had a follow-up conversation with Dean the same day, where he again emphasized that front-running was illegal and admonished Dean not to risk his license "for someone else's stupidity."

57.     In October 2021, Callahan had dinner with Henderson where he protested that there was a significant amount of front-running on the desk.

58.     While Henderson purported to thank Callahan for alerting him to the problem, Henderson did not take any remedial action.

59.     In November 2021, Callahan passed the licensing exams and began trading seven-to-ten-year notes.

60.     His newly assigned seat put him next to Glenn, where he observed Glenn continue to engage in front-running.

61.     On more than one occasion, Callahan told Glenn that what he was doing was not allowed.  Glenn simply shrugged off the warnings.

62.     In early December 2021, HSBC reneged on its promise to consider Callahan to replace Leary as head of the desk (undoubtedly, because of Callahan's repeated complaints about front-running) and instead announced that Stefan D'Annibale had been hired.

63.     On or about December 14, 2021, Callahan told D'Annibale that there was an "epic" front-running crisis on the desk and urged D'Annibale to address the problem.

64.     Callahan provided D'Annibale with a detailed account of the front-running incidents he observed involving Yip, Yang and Glenn.

65.     Callahan offered to talk to the desk again about the need to stop front-running.

66.     Just a few days later, on or about December 17, 2021, Callahan met with Glenn, Takvor, Dean, Kyle Hackett (Global Markets Analyst) and others to warn them about the illegal activity.

67.     Between January and early February 2022, Callahan twice more notified D'Annibale that the illegal conduct was ongoing, although the situation had somewhat improved.

68.     Nonetheless, the front-running continued.

69.     For example, in the middle of February, DoubleLine Capital informed Carl Neuhaus (Managing Director, Head of G10 Rate Sales, Americas) that it was going to "roll forward"[6] on approximately $900 million in old bonds.

---

[6]     A trader "rolls forward" when he simultaneously offsets his current position and establishes a new position.

70.     Neuhaus informed Glenn about this, who then started selling old bonds in the broker screens and moved the price, resulting in a significant profit for the Bank.

71.     In another example, Andrew DiMaria, a portfolio manager at Point72, asked the Bank to sell $100 million worth of long bonds at 3:00 p.m. on March 1, 2022.

72.     Glenn sold long bonds before the 3:00 p.m. deadline and then filled DiMaria's order at the appointed time.

73.     This removed all risk from Glenn's trades and generated a significant profit for the Bank, to DiMaria's detriment.

74.     Callahan told Glenn that he should have given DiMaria a better price on the trade given how much Glenn's trade had moved the market.

75.     Glenn disagreed.[7]

76.     DiMaria later complained to Callahan about the aggressive trading Glenn engaged in before executing Point72's order.[8]

## III.   HSBC UNLAWFULLY RETALIATES AGAINST CALLAHAN

77.     On March 7, 2022, only a month after Callahan's most recent conversation with D'Annibale about the ongoing front-running problem, and less than a week after Callahan chastised Glenn for front-running on the Point72 trade, D'Annibale suspended Callahan.

---

[7]     Glenn could have avoided front-running by asking DiMaria for pre-hedging authority in writing but failed to do so.

[8]     Callahan was so concerned about the illegal practice that in early March 2022, he notified an attorney with the U.S. Commodity Futures Trading Commission ("CFTC").  A few weeks later, the attorney stated that front-running was not within the CFTC's purview and suggested that Callahan instead file a complaint with the U.S. Securities and Exchange Commission or the U.S. Department of Justice.

78.     According to D'Annibale, a complaint had been lodged against Callahan, requiring an internal investigation.

79.     D'Annibale disabled Callahan's access to the Bank's platforms and directed Callahan not to contact anyone at the Bank.

80.     He also placed a "hold" on Callahan's 2021 bonus, which was scheduled to be paid at the end of that week.

81.     D'Annibale refused, however, to state what Callahan had purportedly done wrong.

82.     On March 9 and 11, 2022, lawyers representing HSBC interviewed Callahan, who was not represented by counsel at the time.

83.     They claimed that the Bank placed Callahan on administrative leave because the Chicago Mercantile Exchange ("CME") had requested information about five of Callahan's trades.

84.     This was a routine request in the industry, and HSBC's decision to preemptively suspend Callahan was highly unusual.

85.     Upon information and belief, HSBC typically does not place traders on administrative leave while reviewing CME information requests.

86.     Indeed, upon information and belief, the CME had referred Glenn's trades to the Bank for review on multiple occasions, but in not one of those instances was Glenn put on administrative leave.

87.     During the interviews, Callahan asked HSBC's lawyers for more information so that he could fully explain the trades, but they did not provide any.

88.     Callahan subsequently retained counsel, who, on or about March 29, 2022, reiterated Callahan's request for more information since he had been provided with little, if any, context for the trades in question.

89.     Among other things, counsel asked that HSBC make available the screens from the small number of trades under review so that Callahan could fully and accurately respond to the Bank's inquiries.

90.     Counsel also notified HSBC's attorneys that Callahan had additional information to share, referring to the persistent front-running crisis.

91.     HSBC did not respond.  On April 4, counsel again reached out to share his concerns about the Bank's trading practices.

92.     The next day, April 5, HSBC fired Callahan, claiming—nebulously—that his trading created "risk" for the Bank.

93.     In fact, Callahan had multiple conversations with D'Annibale about what his risk limits were, during which D'Annibale admitted that he had not seen anything in Callahan's trading that worried him.

94.     After firing Callahan, HSBC refused to pay his bonus from the prior year and filed a negative U5 with the Financial Industry Regulatory Authority.

**<u>FIRST CAUSE OF ACTION</u>**
**(Violation of NYLL § 740)**
***Against All Defendants***

95.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

96.     Plaintiff disclosed to multiple supervisors an activity, policy or practice of the Defendants that he reasonably believed was in violation of law, rule or regulation.

97.     Plaintiff also objected to such activity, policy or practice.

98.     As a result, Defendants took retaliatory action against Plaintiff.

99.     Defendants' retaliatory action was willful, malicious or wanton.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against

Defendants, containing the following relief:

A.      An injunction to restrain continued violations of NYLL § 740;

B.      Reinstatement, including full fringe benefits and seniority rights;

C.      Compensation for lost wages, benefits and other remuneration;

D.      An award of punitive damages;

E.      A payment of reasonable costs, disbursements, and attorneys' fees;

F.      Prejudgment interest on all amounts due;

G.      A civil penalty of an amount not to exceed ten thousand dollars; and

H.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 11, 2022
New York, New York

**WIGDOR LLP**

By:

Valdi Licul
Laura Edidin

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
vlicul@wigdorlaw.com
ledidin@wigdolaw.com

*Counsel for Plaintiff*

14